The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. All right, be seated, please. All right, first case we're going to hear is Courtland v. Union Carbide. Mr. Callahan, would that be okay? Thank you, Your Honor. May it please the Court, my name is Michael Callahan. I represent Courtland in this matter. I think, first of all, I'd like to apologize to the Court and especially the law clerks for the size of the appendix and the volume of the record in this case. Well, I did observe that the district court wrote an opinion over 400 pages. Correct. And I think there are at least three copies, maybe four copies in the various files here. Yes, Your Honor. And as I watched the law clerks come in and having to make two trips, I felt very bad about that. So I extend my apologies to everyone for that. Obviously, this is an environmental case, and we're going to get pretty in-depth on the statutes, rules, regulations, both federal and state environmental law. But before we do that, I'd like to cover some big-picture issues that relate to every issue related to this Courtland matter against Union Carbide. First of all, Union Carbide without question has released hazardous substances onto the Courtland property. Secondly, there is no evidence that Courtland has released any hazardous substances to Union Carbide or anywhere else. Third, this case has been going on for a long time. I'm not sure why this matters, but that doesn't seem right. Pardon? I thought there was evidence that on the Courtland property there had been releases on Courtland itself. That's correct. You just said there was no evidence that Courtland released any substances on their property or anywhere else. No, to UCC property, Your Honor. You said, or anywhere else, is what I'm trying to make sure. You agree that there is evidence that your client released it onto its own property. Yes, correct. Right. And if I misspoke, I apologize to the Court. But what I meant to say was there's no evidence of contamination emanating from Courtland to the UCC property. That was my point. So what Courtland has sought in this action from day one, really two things. Courtland has asked UCC to stop polluting its property. And second, Courtland has asked UCC to clean up what it did pollute onto the Courtland property. And one of the points I want to make related to Your Honor, Courtland has never asked and would never ask because the law does not provide for Union Carbide to clean up anything Courtland did to its own property. Courtland has never asked that. What Courtland has asked is that whatever came from Union Carbide to the Courtland property be cleaned up. Again, we're not asking anybody to clean up any mess that's our mess. That's a fair game. There's no way to do that under the law. But there's just a debate about that, right? Like the judge below found that you were, in fact, asking them to clean up stuff that you had put on your own property. The judge did an allocation of 75-25, and I think the judge misunderstood our position. Without question, and let's back up one second, Union Carbide came in in this case and they did soil samples on our property. They did not do water samples. So this case is mostly about groundwater and water samples. So Union Carbide found container. Groundwater would show up in soil samples, wouldn't it? There are two different types of tests. So the soil test will tell you what chemicals are there. But it doesn't tell you what chemicals are in the groundwater itself. So a soil test is not testing water. And in this case you. What's a test? I mean, if the soil is moist, the water is embedded in the soil, and you test the soil, it's just a matter of what test you run, isn't it? You take a core that's wet, and it probably is wet. It's going to be always wet if there's groundwater there. You take a core and test it. It seems to me you'll discover the same thing. I don't know how you get a water sample from a rock. You suck it out, I guess. Here's my point. Soil does not migrate. Water. It migrates through the soil, but when you're testing it, it leaves the residues on the soil and the water in the soil. It does, Your Honor. I can see that. I agree with that. Yes, correct. You know, what might be helpful here, because there are a number of claims, is for you to go through and specifically tell us, this is what we asked the court for, this is what the court didn't give us, and here's why we think that was wrong. Sure. Let me then start off. So the first case before this court is Courtland 1 and Courtland 3, as we refer to those. Courtland 1, we have assigned error to the court for its analysis under CERCLA. And as this court's well aware, there are five elements to CERCLA, and we satisfied each and every element. So what exactly did you ask for? We had a roughly $36,000 in response costs to the tech part. That was from what? That was from the tech part. No. How did the $36,000 accrue? What was it for? Okay. If I can back up just one second, the $36,000 was for our expert to go in and do water sampling and drill wells and monitoring wells on our property at the upper end of the property closest to the tech part. So that was the third. So why do you say Union Carbide was responsible to pay that? Yes. Let's get to what you say the error is. Yes. Let's go back to the very beginning of it. So what we thought was from day one, and our allegation is, Union Carbide caused Courtland to incur these response costs under CERCLA. And the reason for that, the tech part is a well-known hazardous waste. It's been under a RCRA corrective action for 50, 60 years. It emanates all kinds of chemicals everywhere. I mean, that's just a fact. I know you said all this in your brief, and you relied on the fact of Section A. Yes, Your Honor. And you said they satisfied that. And I think the district court granted you that. Yes. They said they agreed with you. Yes. And your whole brief argued something the court granted you. What you didn't address in your brief is B, which is the defense. And the defense is there's no liability if the release or threat of release were caused by bump, bump, bump, a third party. Right. And the court found that it was caused by a third party and, therefore, denied you those costs. In other words, it addressed the defense. You didn't address the defense in one line in your brief, B. You don't even cite B. And that was the whole basis for Carbide's defense to that. And that was the finding of fact by the district court on page 202, whatever it is, 259. Well, Your Honor, maybe then I misread the court's order. But how I read the court's order was the West Farm standard, which is not an element of CERCLA, which is a causation standard. It is causation, but you misread that opinion, too, which is exactly the same thing. In other words, under A, you qualify for your costs. Yes. Under B, the other party gets put on a defense, and it shifts. The cases say it shifts the cause standard to the defendant. In other words, normally you would have to show cause under the A, but you don't. It's sort of an absolute liability. But B says there shall be no liability under subsection A if they can establish by a ponderous evidence that the release or threat of release were caused. In other words, and the court said it was caused by the debris on your property, which is a third person. That's one of the three exceptions. And you never take issue with that. And that's the Westberg, that's the holding. And you criticize them because they talk about causation, and, of course, they're talking about the causation in B, which is if the defendant can show causation, the defendant can win. Not to elongate this, but I was under the impression, perhaps incorrectly, that your basis for the $36,000 claim was that somebody from Union Carbide called up your client and said, you know, we'd like to do some testing, but they never did. Yes. And so you tested in response to that phone call. Is there some other basis that you did that work? No. That's the basis. So I've represented Cortland 20-some odd years. So I got a call from one of the principals of Cortland Company, and he said, this is weird. I got a phone call from Union Carbide wanting to drill holes on our property and do testing below the tech park, to which I said, well, that is very strange. Let's see if they ever call you back. They never called back at all. So I had a discussion with my client, and I brought in an expert, and I said, the reason why I think they're trying to do that testing is they're worried about contamination emanating from the tech park onto the Cortland property. When you say I said, so this is the reason it was done was based on your estimation of why the phone call came in? Yes, and what the expert said with respect to the tech park. So at that stage, our expert Where is that? Tell me where I find what the expert said when you were making this decision. I'm trying to figure out what was the basis of the decision for the 36,000 wells. And I assume your conversation with your client, which I guess before now was privileged, isn't part of the record. Is there anything in the record about what information did go into that, or is this sort of privileged discussion you had with your client part of a deposition or something? Where am I getting this information? Well, it was testified to by Mr. Treslow at trial, the origins. And Mr. Treslow testified about talking with Dr. Scott Simonton, who was our expert in the case, who did research on the tech park to determine what contaminants were coming from the tech park so he knew which contaminants to test on the Cortland property. Yeah, but there has to be an actual release, which I don't think that you argue there was, or a threatened release. And that's why I'm asking the questions. It looks like the threatened release part could only come from the fact that there was a single phone call, but nobody knows why. I mean, what entitles your client to get money from Union Carbide on that basis? Well, the tech park is a known hazardous waste leaking facility. We were adjoining to the property. We were right below it. And the expert did his analysis on how the water and the ground flow, water flow, ground water might come on our property. And that was the basis of the decision by the client. So why is that, if it's not an actual release, why is that a threatened release under the statute? Well, because it's a known hazardous waste facility and we are downgradient from the hazardous waste facility. And we all know the water migrates downhill. So anybody, under your theory, it sounds like anyone that's downstream from a potential contaminant can test when they want and that other owner has got to pay for it. Well, and yes, under CERCLA, and the idea under CERCLA is to allow property owners to protect their property from contamination from other sources. And I do note in our brief we talked about the DBT chemical. That was found on our property. And the only source for DBT is Union Carbide. Even in the wildest scenario of carbides, what could have happened on Cortland property, there's no allegation that DBT was ever in any product or any process on the Cortland property. That was only Union Carbide. And I see I'm out of it. I'd just like to get back. I want to hold you a second here on that. Sure. The court said, indeed, such costs, those $36,000, were incurred in direct response to Cortland's concern that contaminants from Tech Park were migrating to the Cortland property groundwater and were thus necessary prerequisite to enable any potential and subsequent measures to ensure CERCLA quality cleanup, as CERCLA and NCP both contemplate. Yes. So your whole discussion now with Judge Agee, basically, the court went your way on that, right? Yes, Your Honor. All right. So the very next page, the court applies this Westberg standard and, of course, the statutory standard. The court says, nevertheless, consistent with the findings and credibility determinations, blah, blah, blah, blah, the court concludes that Union Carbide has demonstrated by preponderance of the evidence that the Tech Park is not the source of the constituents of Techland and Cortland's groundwater and, therefore, denied that. Now, what it was doing was applying exactly what Westberg said. Westberg said, contrary to the rule followed in most areas of the law, the burden of proof as to causation in CERCLA lies with the defendant. And that's what the court recognized. And then it says, because the defendant bears the burden of proof as to causation, a defendant to survive summary judgment must come forward with sufficient evidence from which a jury could find the defendant was not the source of the contamination. And that's exactly what the court found. As a fact. And nobody's challenged the fact-finding in this case. You've challenged the causation argument. And that I'm reading now from Westpharm. And Westpharm inherits the statute, which is B, Section B of the statute. And Section B of the statute says there shall be no liability for those types of cause, no liability under Section A for a person who can establish by a preponderance of the evidence that the release or threat of release were caused solely by a third person. And that's what the court found as a fact. And so it denied your cause. But you never cited B. You criticized Westpharm that relied on B and said it was a wrong causation case. And it got it. I think it got it exactly right. I mean, it's construing. And we're bound by it, too. And so the only way you could get out from under that $36,000 is to say the court was wrong in concluding that carbide carried its burden. I mean, what's wrong with that? What's wrong with what the court did? Our position is a legal position. Well, this is a legal position. I mean, you're not challenging the facts. Correct. It found as a fact that you qualified for those cause. Yes. You had a concern, and it was a need to check that out. The court gave you the benefit of that. But then it found carbide showed that it was not the cause. Yes. And if it's not the cause under B, the defense, it has no liability for it. That's what's right. Our position is that the threat of contamination from the tech park alone was enough to trigger CERCLA response calls. Yes. The court agreed with you. That doesn't get you anywhere. Because the next step is, okay, now you're justified in incurring the cost, but you can't pass it on to carbide. There's no liability, carbide, if they prove by preponderance of the evidence that they were not the cause. And the court found on page 204 of its opinion exactly that, that they were not the cause. And in the next paragraphs, they denied those $36,000 for that reason. Now, what's wrong with that? Again, our position is the Westpharm analysis is inapplicable to CERCLA, the statute itself. It just quotes CERCLA. I just read it to you. It says, contrary to rule followed in most areas of law, the burden of proof as to causation in a CERCLA case lies with the defendant. And then it says, the next column, it says what the defendant must prove, paraphrasing B.  All right. Can I add, maybe I'm, I just want to make sure I'm understanding your argument. So I sort of understand your, or understood, maybe incorrectly, your argument on 56 and 57 to dispute this factual finding. But you do so by saying, listen, you should have, like, listened to our expert. Correct. All right. But you understand, that's like a really high bar, right? Because the district court effectively found that your expert was not credible. Understood. Right? And so it is true that we could, in some theoretical world, disagree with this experienced district court judge's credibility determination about your expert. But that's the argument that you're effectively making with respect to what Judge Niemeyer is saying, is that our expert was indeed credible, contrary to the district court. And their expert did not carry the day. Mr. DeHaven, who's their expert, a non-engineer, used words like there is a probability, it might, it could have. It was, his testimony was couched in terms of not absolutes. And to answer your question as direct as I can, yes, the district court relied on his testimony over our expert. That is correct. But that's the argument that you've made. That's correct. Because you could have, in theory, for example, made an argument that Union Carbide didn't exercise due care, right, which is part of, you know, B3. That's not the argument. You've not made that argument. That's correct. Right? Nor, I guess, the other piece of that, you know, the precautions against reasonable acts and omissions. You've not argued that the district court erred in those sort of subparts of B3. That's correct. Okay. Thank you. You're correct. Thank you. And I see my time is up, and I apologize. Okay. You had some rebuttal. All right. Mr. Leister. Good morning. My name is Dan Leister on behalf of the Appellee Union Carbide. Just to touch base on what my colleague just said about not speaking in absolutes, I think, Judge Richardson, you hit the nail on the head. We're dealing with a clearly erroneous standard with respect to the findings of the district court in terms of which expert had the more convincing theory, who was credible in terms of where did these constituents come from. The district court looked at the evidence, saw it as it came in, and made those credibility calls and decided, as a matter of fact, under subsection B, that UCC maintained its burden of proof as to a lack of causation. Can I? I hate to ask you because this puts you in a tough spot. Sure. You're an officer of the court, and I trust you, and these are complicated. Do you think Judge Niemeyer is right here in the framing of what happened, that being that under A, the district court judge here agreed with your opponents that your release or threatened release did cause the testing, but then at step B found as a defense with the burden on you that it was caused by somebody else and that meant no recovery happened? The way the district court went through the analysis was the district court found that Cortland satisfied its burden under A by commonality of constituents. They said there's constituents in your groundwater that match constituents on UCC. That's enough because you don't have the burden to prove causation. So I'm going to find that's enough under A, which is correct. It is an easy to satisfy A. That then shifted everything to UCC, and UCC needed to establish. But that's under B. Sorry, did I misspeak? No, you were right. It shifted to subsection B, and then UCC now had the burden. Cortland didn't have to do anything at that point. But what Cortland is advocating for here is if they satisfy A, there is no B. And you're right, Judge Niemeyer. Cortland's brief does not. I think it's an issue with A, and while there is a good question whether they satisfied A, whether they were responding just to a telephone call or something else, but the court gave them the benefit and said they satisfied A and incurred those costs out of a need from their concern. Correct. Then the court went to B, which says the burden of proof is on the defendant to show causation, and Union Carbide satisfied that burden and therefore no liability. That's correct. Yeah, that's how I see it too. With respect to shifting gears a bit, I know there's some rebuttal. And by answering the subsection B question, whether it was an actual release or a threatened release under A doesn't really make any difference if the defendant carries their burden under subsection B. So actual release and threat of release are listed in subsection B. Both A and B. A and B. So this argument that if it's a threat of release case, there is no B is not true because the plain reading of subsection B specifically lists threat and actual. So trying to cast it as this is a threat case, and in threat cases there is no causation, there is no subsection B, the statutory language directly contradicts that. The bottom line would be if the court finds for the defendant on B, then I guess in effect the burden has to shift back, at least on appeal to the plaintiff, to show why that finding was correct. And I'm assuming your argument here is that argument was never made. The argument being made on the appeal in our view, in Union Carbide's view, is that the challenge the courtland's raising is in fact a factual challenge as to subsection B. But they never addressed B. They never addressed the defense. The whole brief, maybe I've misread it, but the whole brief was challenging, was trying to prove that they satisfied A, that they incurred those costs out of a concern and a need to cover that, and they addressed that, but the court went with them on that. The court granted courtland pass A. So, again, we're not on appeal as to whether courtland satisfied A. According to the district court, they did. We didn't file a cross-appeal on that issue. The question is, does subsection B apply to threat cases? It clearly does. The statute says that it does. The district court said that it does. And it bunches together in both A and B. Correct. A threat, an actual threat. So I guess Union Carbide is giving courtland the benefit, that even if they had mentioned subsection B and challenged the findings of subsection B, that's still a clearly erroneous standard that courtland would have to satisfy, which they didn't. I mean, that West Farm case laid the shifting burden of causation as the statute provides, and they spent the whole time arguing that West Farm was against the law, contrary to law. And I don't understand that argument. I'll talk to him some more when he comes up and he hears me.  But I'm curious as to how we should approach it from his point of view. I agree with you, Judge. The glaring issue is if we're not applying West Farm and we're not applying A, is A satisfied, then we go to B, then what are we applying? If analysis stops at A, where do courts go next in terms of causation? Courtland hasn't presented what occurs in cases like this. Other than it just stops. Once you satisfy A, it doesn't go to subsection B. Can I just ask you what I think is totally hypothetical? I'm not trying to say it's this case. But imagine at Intech Park on day zero, like, your guys accidentally, like, dump a bunch of barrels out, right, plainly release bad stuff. And then Courtland says, like, this is a real threat to our property because we're downgradient. And so we want to dig a bunch of wells to test, you know, when that or if that, you know, those chemicals cross the line and start infecting our property. The point is at this point, at that point, we would say hypothetically that A has been satisfied. But then after the testing takes place, if it turns out that all those cores show that the chemicals on the Courtland property came from Courtland's own actions, then B would be the way that you would say, yeah, no, even though these were necessary under A, you're actually responsible for your own problems. That's sort of colloquially how we're thinking about what's happening here? Somewhat. I would push back a little bit on that hypothetical in the sense that in that scenario it would be hard for Union Carbide to satisfy B because they are actively dumping it. So they can't say, oh, no, the threat was from some third party. Courtland would come back and say you were actively dumping things from my property. Yeah, they might say, all right, fair enough. I take that's a harder hypothetical. Right. Conceptually that's the process. Conceptually that's correct. When there's commonality of constituents and the testing comes back that Courtland's causing it from their own operations, this was a coal field, there's oil drums all over the Courtland property, and the district court found that they were more probably than not the source of the constituents. Well, the issue in that hypothetical I think would be were those actions a threatened release as opposed to an actual release? Because I think it is clear that there are two conceptually different claims that could be made. Right. And in the classic sense of a threatened release, it would be it hasn't occurred yet, they're notifying people, we might have a problem here, and maybe they install some type of device to stop it. Turns out it didn't actually manifest. Under the statute that would still be a threat of release. It would be directly tied to the actions of the defendant. So the fact that it didn't actually happen. And you couldn't, in that scenario, your point is you couldn't establish B in that context. It would be difficult to establish B in that context because it's from your own actions that's causing the other side to. There's no argument that, and this is your point on B, I'm following up, that when you dump the barrels out or whatever the hypothetical is, there's no argument that Courtland did that. You know you did that. Correct. Correct. Shifting gears a bit to Courtland 3, I know we had a lot of discussion on Courtland 1. Courtland 3, just so the court, I can orient the court, there's four different Courtland cases. Courtland 3, when it came time to the district court's resolution, was limited to discharges into the northern boundary ditch. The reason why it appears somewhat complex procedurally is the pre-suit notice requirements. So originally Courtland 3 had discharges into the northern boundary ditch that were alleged and discharges into the southern boundary ditch that were alleged. Courtland failed to satisfy the pre-suit notification requirements for the southern boundary ditch. So the court had to strike that out, sever that away from Courtland 3. So Courtland 3 proceeded only on the northern boundary ditch. So when the court was looking at whether there was standing in Courtland 3, it was looking at, did Courtland suffer an injury in fact with respect to discharges into the northern boundary ditch? As the Supreme Court cases have set forth in Spokio and in Laid Law, every claim in every lawsuit needs to be supported by injury in fact. You can't establish injury in fact for one claim or one. And the northern drainage ditch is downstream from Courtland's property, is that right? Correct. So Courtland's property, if you look at page 6 of the order, a phase 1 order, it has a picture. I have to refer to it a lot when I'm going through this. Courtland is south of Philmont and Massey, and the northern part is the northern boundary ditch. The water flows north. So essentially any discharges in the northern boundary ditch is going away from Courtland's property. Not from Courtland's property. Away from Courtland's property. It doesn't really matter who the discharge is, it's downstream. It's downstream. It would have to be uphill. Correct. So at the summary judgment phase, it's important. Courtland's brief makes a lot of mention of prior standing determinations. This is a determination that the district court has to continue to make. They make it at the pleading phase, they make it at summary judgment, and they make it at trial. The court found that at the pleading phase, you have to assume that all allegations are true. So the court found there's enough allegations to establish injury in fact. It gets to summary judgment. And at summary judgment, Courtland comes up with a theory of in times of heavy precipitation, the river backflows up onto Courtland's property. It ordinarily goes north. It ordinarily goes away from our property. But under circumstances, the river reverses flow onto us. So for summary judgment purposes, that's just a dispute of fact. For summary judgment purposes, the district court said that's enough to survive Rule 56. I'm going to allow this to proceed to trial. When it goes to trial, the court sitting there as the finder of fact, looking at the expert testimony, rejects this reverse flow theory. The concept that the water backs on itself was advanced by Courtland's sole expert, Dr. Scott Simonton. You've read, likely, the district court's opinion thoroughly, and he has a lot of criticisms of Dr. Scott Simonton. His methodology, his practices, the specificity of his opinions, these are things that the judge is seeing firsthand as the finder of fact. And it's based upon those findings that the court said this reverse flow theory carries no water, pun intended, and therefore rejected it and found there's no injury in fact, there's no standing. So when it comes to standing with the northern boundary ditch, the court should affirm Courtland 3 on those grounds. The appeal you're going to hear later today or right after this, that has to do with Courtland 4, which is discharges into the southern boundary ditch. But Courtland makes a lot of arguments of if you can find a single discharge somewhere else, that gives you standing as to all claims and all lawsuits, and that's simply not the case. This court recently in the Somerville decision said it's standing for every claim, for every type of relief. The Supreme Court said that too. Right, every claim, every type of relief. So if you're seeking an injunction and compensatory, you need standing for both. If you're saying discharges to the northern boundary ditch is a violation and discharges elsewhere of a violation, you need to establish standing. And if you look at the environmental cases, the thing that stuck out to me was a person named Wilson Sheely. This is in Gaston 1 versus – I'm sorry, Friends of the Earth versus Gaston Copper case. This was a property owner downstream. And the plaintiff was downstream from the solution.  It's all downstream. And these environmental plaintiffs were always able to establish someone in their group, in the plaintiff class, was used the land, owned the land, they owned the lake. Their activities were changed or diminished due to this. In this case, we have a former coal yard that's being used as a recycling facility that has 11 constituents in its own soil and its own groundwater that it caused that has no use of anything with the northern boundary ditch. The northern boundary ditch isn't just a UCC. There's I-64s right there. And there's culverts coming off the highway that also dumps into the northern boundary ditch. So there's nothing – there's no injury associated with Cortland and any discharges into the northern boundary ditch or from the northern boundary ditch. And although it's a de novo review for standing, there are – it's really tied into a lot of the factual determinations by the court. So for those reasons, Union Carbide requests that this court affirm Cortland 1 related to the CERCLA and Cortland 3 related to the northern boundary ditch discharges. And other than that, we rest on our arguments. Thank you. So just for – just for clarification, which one of the four claims is the kayak trip? That's number one. Or – that's Cortland 2, I believe. Cortland 2. You'll hear that this afternoon.  So that's the – Sorry. Yes. Okay. Yeah. So Cortland 1 was just Tech Park, and then Cortland 2 you'll hear from other parts of the – And Cortland 3 was just water, just what you told us. Just from the northern boundary ditch. And then Cortland 4 was southern boundary ditch, Clean Water Act. Okay. Thank you. All right. Thank you. All right. Mr. Calhoun. Thank you, Your Honor. Let me address the standing issue. First of all, the analysis is did the damage caused by union carbide impact Cortland? And to that I say yes. You're on number three now. Number three. I'm sorry. Yes, Your Honor. Yes, I'm talking about the standing issue for the Clean Water Act. And so in this case, and I'll make this argument, Cortland is the next door neighbor to Union Carbide's Philmont facility, which is a hazardous waste facility. Everything that happens on Philmont impacts Cortland. For example, Mr. Treslow testified at trial, if there's hazardous waste on that site, that'll decrease the value of the Cortland property. If a buyer is to know that a Clean Water Act violation is being committed on the far side of the Philmont property, that will impact the value of the Cortland property. It is within the scope or the proximity of the damage caused by union carbide. All these things run together for me, so I apologize. But I thought the district court dealt specifically with that and found that the evidence simply was insufficient. The court was getting the same rent today it had gotten years ago, it was going to get it for years to come, and it had done no marketing, had no appraisal, any other type of tangible evidence that would show an injury. I mean, what was your evidence? I mean, you're basically making an argument, as I understand it, that the district court made factual errors in evaluating the witnesses. Well, I'm not trying to go down that path. What I'm trying to say is, and if I could back up one second, this issue of standing, I've got to say, is a bit confusing because we held a three- or four-day temporary-slash-permanent injunction hearing on this very issue early on in this case, and the court found we had standing. This was in Cortland III. But you understand, right, that the basis for standing changes as the degree of proof increases as you go from a motion to dismiss to summary judgment to trial? I do. And what I'm trying to say here, if you go back to the purpose and the intent of a citizen suit, when we look at it on Cortland's behalf, there's a facility beside us causing environmental problems, and that facility is causing Clean Water Act violations coming at us, coming on the other side of us. But you've got to stay on this three. The court isolated Cortland III to that one ditch. That's correct. And with respect to that one ditch, the question is, were you able to show in any way that you were hurt? And the court concluded no. And one of the main things was the court was not satisfied that the water ever went back up. Isn't that what the court did? That's correct. And that was not the sole reason that we alleged standing in this case. That was one of the many reasons. Well, it seems to me if you're not injured by their conduct, the river is going the wrong direction. Well. The only way you get a threat is if the river is going in the right direction. It's the same watershed. It's an adjoining piece of property. There is evidence, again, that it backs up, but the court made its findings. Those are out there. That was one of the arguments. But were the adjoining landowner. But isn't that sufficient to eliminate standing? I mean, to support the lack of standing? That finding of fact, isn't that sufficient? I don't think so. And that's what I'm trying to argue to the court. It's the facility and the harm to the environment. So when you are a citizen's plaintiff, you are addressing a facility and all the harm that that facility causes. It has to cause some harm to you. A stranger in California who has a home in the mountains there can't come to West Virginia and say, I've been harmed by that because the environment is common to all of us. There's no standing there. I mean, that person cannot be afforded relief and has not been harmed and not hurt in West Virginia. And I think that's what the court relied on, isn't it? It did. And what I'm saying, generally speaking, if you look at the case law, when you qualify as a citizen suit and most of them are environmental groups and they have somebody who says, I use and enjoy the Davis Creek area. That's typically what you find for standing cases within a citizen suit under the Clean Water Act. In this case, it was an adjoining landowner. So there's no we're not saying that the north boundary ditch drains directly onto the Cortland property. It does not. We can see that. It does not. It's not even close. It's on the other side. It's within 100 feet. So when we come in as a citizen suit trying to address the environmental problems at the facility, the facility includes the entire Fillmont dump, open dump, which we allege it to be, and all that comes off of it and all harm to the environment. So, for example. So is your standing because you're a landowner in the neighborhood? Yes. An adjacent landowner to the neighborhood. That is one of our arguments, yes. Maybe I've got this confused with some of the public nuisance cases, but don't you have to show some special harm besides just being a general member of the population? My argument to this court is when you qualify and you send your notice to EPA and DEP and all these entities, you're essentially stepping into the shoes of an attorney general. So you're not only representing the property owner of Cortland that's adjacent to you. I mean, you keep talking about liability to the environment, but everybody in the United States can't come and bring that suit. Not everybody from California can come in and become an attorney general in enforcing your property, enforcing the rights of your property. And it seems to me Gaston precludes that, doesn't it? I think Gaston is the greatest case to support what I'm saying here. Well, they went to, they pointed specifically to the harm caused to the plaintiffs. Yes. Directly by the environmental violation. And here the court says there is no specific harm caused to the plaintiff in this claim. I mean, we're isolating claims and so forth. And what I'm trying to argue to the court, it's improper to isolate claims. You isolate. But that's beyond. You guys all set it up with Cortland 1234. I mean, wasn't that all agreed to? No. If you want to know the truth of that one, the court wouldn't let us amend and put it all together in one. So we had to do separate cases for whatever reason. But that's how we ended up with different cases. The reason is you didn't provide the notice you were supposed to. That's correct. Right. Don't blame the district court for that. No. Don't say the district court didn't let us do this when it was your mistake. I can say that on one of the cases we tried to amend it in and the district court denied us to amend that in to the existing claim because of what your Honor just pointed out. And so that left us having to file a separate case.  Thank you. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, G. Steven Agee, Julius N. Richardson